UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ERIC E. FLENTOIL,<br><br>        Plaintiff,<br><br>    v.<br><br>SANTA CLARA COUNTY DEPT. OF CORRECTIONS, et al.,<br><br>        Defendants. | Case No. 18-cv-03486-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Docket No. 44 |

## I.     INTRODUCTION

In this *pro se* prisoner's civil rights action for damages, Eric Flentoil complains about his jailers' handling of medical requests and ADA accommodations requests. Defendants have moved for summary judgment, which Mr. Flentoil has not opposed. For the reasons discussed below, Defendants' motion for summary judgment will be granted as to the medical care claim and denied as to the ADA claim. The Court will refer this case to the *Pro Se* Prisoner Mediation Program.

## II.     BACKGROUND

There are two claims in this action: (1) a claim that Dr. Chyorny's response to Mr. Flentoil's pain violated Mr. Flentoil's Fourteenth Amendment right to due process, and (2) a claim that the County of Santa Clara violated Mr. Flentoil's rights under the Americans With Disabilities and Rehabilitation Act during his stay at the county jail.

The following facts are undisputed unless otherwise noted.

A.     The Parties

Mr. Flentoil was a pretrial detainee who was incarcerated at the Santa Clara County Jail from April 17, 2018, when he was booked into that jail, through at least August 13, 2018 ("the

relevant time period"). Mr. Flentoil suffered from a knee problem; specifically, he had a failed multiligamentous knee reconstruction surgery in 2016 that caused him pain that had existed long before his arrival at the Santa Clara County Jail in 2018. Docket No. 21 at 1, 2. Before his arrival at the jail, Mr. Flentoil had been under the care of Dr. Vaughn at Stanford Health Care. According to Mr. Flentoil, Dr. Vaughn had prescribed crutches, a hinged knee brace, and an opioid pain medication on April 5, 2018. *Id.* at 3.

One Defendant, Alexander Chyorny, M.D., worked as a physician for the Santa Clara Valley Health and Hospital System (HHS). Since 2004, Dr. Chyorny has been the medical director of HHS's Adult Custody Health Services (ACHS), the department that provides all health care services to adults incarcerated by the County of Santa Clara. As the medical director, Dr. Chyorny oversees all aspects of medical care provided to those inmates. He also treats some patients, including Mr. Flentoil. Docket No. 21 at 2.

The other Defendant is the County of Santa Clara, sued as the Santa Clara County Department of Corrections. The County of Santa Clara operated the jail.

B.    Mr. Flentoil's Requests For Pain Medications And Supportive Devices

Upon his arrival at the jail on April 17, 2018, Mr. Flentoil informed HHS-ACHS staff of his knee problem and his need for "appropriate accommodation." Docket No. 21 at 2. Mr. Flentoil had no supportive devices (such as crutches or a brace) and was ambulatory when he arrived. Docket No. 44-2 at 5. He requested crutches. Docket No. 21 at 2. Medical staff provided him a cane during booking, noting that he was limping. Docket No. 44-2 at 5, 10. He kept the cane; the ADA unit at the jail later renewed the approval for the cane several times. *See id.* at 5.[1] During the intake procedure, Mr. Flentoil reported to a nurse that he had a history of using marijuana and methamphetamines. Docket No. 44-2 at 2, 11. A nurse also noted a "history of intravenous drug use in remission." *Id.* at 14.

Mr. Flentoil sought pain medication upon his arrival. Docket No. 21 at 3. Medical staff

---

[1] The ADA unit in the jail is a jail department in charge of compliance with the ADA for each individual. The ADA unit relies heavily on the advice of doctors as to particular disabilities and the needs associated with them. Docket No. 44-2 at 5.

1  initially provided ibuprofen and acetaminophen for pain management.  Docket No. 44-2 at 2.

2  (Medical staff also provided medications to treat Mr. Flentoil's diabetes and mental health

3  problems; Mr. Flentoil does not complain about those medication decisions.  *See id.* at 15-16.)

4  During a medical evaluation by a nurse practitioner on April 18, Mr. Flentoil requested

5  Percocet[2] for his pain.  *Id.* at 2, 21.  His request was not granted by the nurse practitioner, who

6  noted that Mr. Flentoil "bec[a]me angry when provider states he will be referred to the medical

7  team" for an evaluation of his needs.  *Id.* at 21.

8  On April 26, Mr. Flentoil asked a nurse during "pill call" to obtain a knee brace.  Docket

9  No. 44-2 at 5.  The nurse asked that Mr. Flentoil submit a health care request form, which caused

10  Mr. Flentoil to become verbally abusive and "cuss" at the nurse, according to the nurse's notes.

11  *See id.* at 5, 69.

12  Also on April 26, Mr. Flentoil signed an authorization for medical staff to verify the

13  medications he was receiving before he went into custody.  *Id.* at 2, 28.  He told the nurse that he

14  took Percocet and gabapentin for pain, and he identified the CVS Pharmacy from which he

15  supposedly obtained the medications.  *Id.* at 28.  Medical staff contacted that CVS Pharmacy to

16  verify the prescription, but the pharmacy had no record of current prescriptions for Percocet or

17  gabapentin for Mr. Flentoil.  *Id.* at 3, 30.  Medical staff then informed Mr. Flentoil there was no

18  current prescription at the pharmacy.  *Id.* at 30.

19  After dinner on April 26, Mr. Flentoil went on a hunger strike to try to obtain the Percocet.

20  Docket No. 44-2 at 3, 33, 71.  He told a nurse that he had been prescribed Percocet on April 5 but

21  had not picked up the medication before his April 17 arrest due to car problems.  *Id.* at 33.  The

22  hunger strike ended on April 30 when Mr. Flentoil asked for his dinner tray and voluntarily took

23  his medications.  *Id.* at 33.  Medical staff noted that Mr. Flentoil was able to walk with a cane

24  when he arrived at the infirmary on April 30 during his hunger strike.  *Id.* at 71.

25  On May 1, a jail doctor referred Mr. Flentoil to an orthopedic surgeon at Santa Clara

26  Valley Medical Care (VMC) for a consultation about Mr. Flentoil's knee problems.  *See* Docket

27

28  _____
[2] Percocet is "an opiate with serious potential side effects."  Docket No. 44-2 at 3-4.

1   No. 44-2 at 3.  The orthopedic surgeon reviewed Mr. Flentoil's records, including records from a

2   visit with Dr. Vaughn, who was the doctor at Stanford Health Care who had treated Mr. Flentoil

3   when he was out of custody.  *Id.* at 3, 35.  The orthopedic surgeon wrote that, although Dr.

4   Vaughn's plan had been to refer Mr. Flentoil to an arthroplasty specialist for consideration for a

5   knee replacement, such surgery was not now appropriate.  *Id.*  The orthopedic surgeon explained

6   that, given Mr. Flentoil's "active drug use, poorly controlled diabetes, obesity, and current

7   incarceration, he would be at extremely high risk for complications and is not currently a

8   candidate for elective arthroplasty."  *Id.* at 35, 37.

9          On May 4, Dr. Chyorny examined Mr. Flentoil and considered his request for Percocet.

10  Docket No. 44-2 at 3.  Pursuant to jail policies, controlled substances like Percocet are not

11  distributed in the Santa Clara main jail absent extraordinary circumstances.  *Id.* at 4.  Among other

12  things, the inmate must sign a "Contract for Chronic Non-Malignant Pain Management," which

13  includes promises that the inmate will be truthful and forthcoming regarding his symptoms and

14  drug use.  *Id.*  Mr. Flentoil stated that he had last used methamphetamines in Spring 2017 and

15  claimed to have been drug-free in the year since then.  *Id.* at 3.  That was not true:  Mr. Flentoil's

16  urine had tested positive in March 2018 (during a different stay at the jail) for amphetamines.  *Id.*

17  at 3, 45, 47.  Dr. Chyorny determined that Mr. Flentoil was not a candidate for Percocet.

18  According to Dr. Chyorny, Mr. Flentoil's misrepresentations regarding his drug usage made him a

19  poor candidate for such a treatment plan, particularly because other options for pain management

20  were available to him.  *Id.* at 4.  Although Dr. Chyorny did not approve Percocet, he continued

21  Mr. Flentoil's ibuprofen prescription and approved a lidocaine patch for additional pain

22  management.  *Id.* at 3-4.  Mr. Flentoil also requested a hinged knee brace.  *Id.* at 5.  Dr. Chyorny

23  provided him with a soft knee brace that day and submitted a referral for a physical therapy

24  appointment, because a hinged knee brace had to be specially ordered after an appointment with

25  physical therapists at VMC to fit the patient for the brace.  *Id.* at 5.  Dr. Chyorny noted that Mr.

26  Flentoil could walk that day.  *Id.*  Dr. Chyorny also approved an ace wrap, ice, and special shoes

27  to address Mr. Flentoil's knee pain.  *Id.* at 4.

28         On May 31, a nurse saw that Mr. Flentoil was standing straight without using his cane.

4

Docket No. 44-2 at 5-6.  Mr. Flentoil told the nurse that he still had his cane.  Docket No. 44-2 at 5-6, 74.

While waiting to be fitted for a hinged knee brace, Mr. Flentoil began on and after June 15 to demand crutches in addition to the cane and soft knee brace that already had been provided to him.  *Id.* at 6.  A nurse examined Mr. Flentoil's knee on June 19 and noted a chronic pain problem but no deformity, numbness, tingling, or swelling of the knee.  *Id.* at 6, 80, 83.

Dr. Chyorny saw Mr. Flentoil on June 20, and considered the request for crutches.  *Id.* at 6.  Dr. Chyorny noted that a "complete off-loading of weight on the joint may result in less pain, but decreased mobility could potentially worsen Flentoil's unhealthy obesity.  [He] also noted that Flentoil had recently gained 31 pounds," and weighed 321 pounds  *Id.* at 6.  Nonetheless, Dr. Chyorny provided Mr. Flentoil with crutches that day.  *Id.* at 6, 65; Docket No. 21 at 2-3.  At the appointment, Mr. Flentoil also said he would sue in order to get Percocet, leading Dr. Chyorny to again explain that Percocet was not an appropriate medication for Mr. Flentoil.  Docket No. 44-2 at 4.  Mr. Flentoil then requested gabapentin, which Dr. Chyorny also declined to provide, explaining that it was a controlled medication that was not appropriate for Mr. Flentoil.[3]  Dr. Chyorny offered a different medication for pain relief, Pamelor, but Mr. Flentoil declined it.  Mr. Flentoil remained unsatisfied but conceded that the lidocaine patch did help manage his pain "a little" and asked that it be renewed.  *Id.* at 4, 60.  Dr. Chyorny also attempted to administer a steroid/lidocaine injection into Mr. Flentoil's knee to reduce inflammation and pain, but the needle was too short and Mr. Flentoil refused another injection with a longer needle.  *Id.* at 4.

Later that day (June 20), Dr. Anna Lou administered an injection into the bursa of Mr. Flentoil's knee.  *See* Docket No. 44-3 at 2, 5.  She told Mr. Flentoil that opiates were not necessary or recommended for treatment of his chronic knee pain.  *Id.* at 1-2.  In response to his question whether amputation and a prosthesis would help his pain, she told him that such measures were not recommended treatment for his knee pain.  *Id.* at 1, 6.  When Dr. Lou saw Mr.

---

[3] Gabapentin is not an opioid but "is an addictive medication which is frequently abused, particularly in a custody setting.  Gabapentin has no proven utility in musculoskeletal pain management and it is not approved by the United States Food & Drug Administration for treatment of diabetic nerve pain."  Docket No. 44-2 at 8.

Flentoil a month later (on July 19), Mr. Flentoil reported that the injection helped alleviate the right medial knee pain although he still had pain elsewhere in his knee. *Id.* at 13.

On July 3, Mr. Flentoil met with a VMC physical therapist to be fitted for a hinged knee brace. The physical therapist recommended further physical therapy to address pain and functional impairment. Docket No. 44-2 at 6, 91-92. Mr. Flentoil met again with a physical therapist on August 1, and informed the physical therapist that he was scheduled to have a total knee replacement when he was released from custody and wanted this to be his last physical therapy appointment. *Id.* at 6-7, 95.

Dr. Lou saw Mr. Flentoil on July 19, at which time Mr. Flentoil complained that he had not received his hinged knee brace. Docket No. 44-3 at 2; *see also id.* at 19-20. Dr. Lou called the medical provider at Stanford Health Care who Mr. Flentoil said had provided a hinged knee brace on an earlier occasion, but she was unable to confirm the type of hinged knee brace in that call. *Id.* at 2. In a follow-up call on July 26, Dr. Lou was able to confirm the type of brace that Mr. Flentoil had received in the past and ordered a new one for him. *Id.* at 2, 20. Dr. Lou also provided to Mr. Flentoil a different type of knee brace during the appointment. *Id.* at 2.

On July 23, Mr. Flentoil submitted a health care request, asking to enter a Contract for Chronic Non-Malignant Pain Management so that he could get opioid medications, complaining that Dr. Chyorny and Dr. Lou had not authorized one. Docket No. 44-2 at 67. The request was forwarded to Dr. Chyorny, who already had determined that Mr. Flentoil was not a candidate for such a contract. *Id.* at 5.

On August 14, Dr. Lou saw Mr. Flentoil again. During that appointment, Mr. Flentoil mentioned that the tramadol he had received for dental pain also had alleviated some of his knee pain. Docket No. 44-3 at 2. Dr. Lou "explained that tramadol is another closely controlled drug, like other opiates, and that [she] would not recommend it for treatment of Flentoil's chronic knee pain." *Id.* Mr. Flentoil responded by becoming angry and berating her. *Id.*

On August 13, a nurse noted that Mr. Flentoil had been seen walking with and without crutches; "when without crutches, mild limp." Docket No. 44-2 at 7, 104.

The hinged knee brace that medical staff had ordered for Mr. Flentoil arrived on August

21.  Docket No. 44-2 at 99-100.  Custody staff initially refused to release the hinged knee brace because it had metal inserts that could be removed and made into weapons, and thereby presented security risks.  Docket No. 44-2 at 7, 100.  Two days later, however, the ADA unit approved the knee brace and released it to Mr. Flentoil.  *Id.* at 7, 102.  Correctional officers cautioned Mr. Flentoil not to tamper with the metal pieces in the hinged knee brace and Mr. Flentoil verbalized that he understood.  *Id.* at 7, 102.

On August 21, Dr. Kristin Walsh saw Mr. Flentoil, at which time Mr. Flentoil requested tramadol and gabapentin for pain management.  Docket No. 44-4 at 1.  She explained to him that "tramadol is an opiate and, like other opiates, is a restricted medication in custody.  [She] also explained that gabapentin is a restricted medication and not appropriate for the management of his pain."  *Id.* at 1-2.  There is no evidence that Mr. Flentoil complained again about the specific pain medications he received.

On August 29, Mr. Flentoil requested to be rehoused in the general population.  Docket No. 44-2 at 7, 106.  He removed the metal inserts from his knee brace, claiming that he did not require them.  *Id.* at 7, 106.

On September 6, a nurse observed Mr. Flentoil ambulating in his cell "with no difficulty" while not using his brace, crutches, or cane.  *Id.* at 7, 111.

On September 7, Mr. Flentoil signed a written refusal of the hinged knee brace, stating the brace was not needed because the "crutches and neoprene brace will suffice to aid w/ ambulation." *Id.* at 7, 108.  The medical care provider noted that Mr. Flentoil denied pain at this time.  *Id.* at 108.

At the jail, medical staff often would note when Mr. Flentoil did not complain that he was in any pain.  Nurses and doctors specifically noted that Mr. Flentoil was not experiencing pain on at least 14 occasions from April through October 2018.  Docket No. 44-2 at 5.

Mr. Flentoil has provided minimal information about the consequences of the medical staff's decisions regarding medications and supportive devices.  He states that he needed "assistive mobility devices" of an unspecified sort in April 2018, but possibly crutches, "to alleviate discomfort [he] was experiencing."  Docket No. 21 at 2.  And he experienced "undue suffering"

1    because he had to wait more than 60 days before the crutches were provided to him. *Id.* at 3. He

2    also states that he "endured mental trauma" as a result of his requests being denied. *Id.* at 2.

3    C.    <u>Shower Access</u>

4          According to Mr. Flentoil, when he arrived at the jail, he was put into a special medical

5    housing unit that had certain shower accommodations available for inmates who are at a "slip

6    risk" and those who have difficulties walking. Docket No. 21 at 3.

7          On or about April 20, he was rehoused in the general population unit where there were not

8    accommodations in the showers such as guard rails, shower chairs, or slip-resistant coating on the

9    floor. *Id.* at 3-4. He verbally raised "this concern with the officer on duty" on April 20, and the

10   officer responded that Mr. Flentoil had been cleared to return to general population. *Id.* at 4.

11   Specifically, "[t]he officer told [Mr. Flentoil] in response that 'there is nothing I can do,

12   classification and the doctor already cleared you to return to general population.'" *Id.* at 4.

13         On May 20, Mr. Flentoil submitted a request stating that he was mobility impaired with

14   difficulty going in and out of general population shower that did not have a non-skid mat, that he

15   had "re-injured" his knee when he fell two days earlier, and that he needed to be rehoused from

16   the general population to a special module due to his disability that made the shower in the general

17   population unsafe for him. Docket No. 44-2 at 7, 114. The nurse on duty examined him, called

18   the ADA unit, and advised Mr. Flentoil not to shower until the ADA issue was resolved. *Id.* at 7,

19   114. Mr. Flentoil was rehoused to the special module the next day (May 21) after he submitted a

20   grievance with a second request to be rehoused to the special module. *Id.* at 8, 115.

21         On June 4, a nurse observed Mr. Flentoil walking with no supportive device during pill

22   call. *Id.* at 8, 117. On June 5 or 6, the ADA unit cleared Mr. Flentoil to return to the general

23   population. *Id.* at 8, 117, 119.

24         On June 8, after being contacted by the ADA unit, Dr. Chyorny approved another

25   rehousing so that Mr. Flentoil could have access to a special shower. *Id.* at 8, 119.

26         As mentioned earlier, on August 29, Mr. Flentoil requested to be rehoused in the general

27   population and stated that he did not need the hinged knee brace with the metal inserts. *Id.* at 7, 8,

28   106.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### III.    VENUE AND JURISDICTION

Venue is proper in the Northern District of California because some of the events or omissions giving rise to the complaint occurred at a jail in Santa Clara County, which is located within the Northern District. *See* 28 U.S.C. §§ 84, 1391(b).  The Court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983 and the ADA/RA. *See* 28 U.S.C. § 1331.

### IV.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In a typical summary judgment motion, a defendant moves for judgment against a plaintiff on the merits of his claim.  In such a situation, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324.

When a defendant moves for summary judgment on an affirmative defense on which he bears the burden of proof at trial, he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial. *See Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is

based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Statements of fact in Mr. Flentoil's amended complaint are considered as evidence because the document was signed under penalty of perjury. *See* Docket No. 21.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and inferences to be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *See id.* at 631.

## V.    DISCUSSION

A.    Medical Care Claim

1.    Legal Standard

Inadequate medical care of an incarcerated person may violate his federal constitutional rights. The source of the right differs depending on whether the incarcerated person is a pretrial detainee or a convicted prisoner at the time of the alleged violation. The Eighth Amendment's Cruel and Unusual Punishments Clause is the source of the relevant right when the plaintiff is a convicted prisoner, and the Fourteenth Amendment's Due Process Clause is the source of the relevant right when the plaintiff is a pretrial detainee. *See Gordon v. County of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018); *see also Bell v. Wolfish*, 441 U.S. 520, 537 n.16 (1979) (Due Process Clause is relied on for pretrial detainees' claims because the "'State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.'"). Under both the Due Process Clause and the Eighth Amendment, one of the key issues is whether the state actor has acted with "deliberate indifference" to a medical need. For many years, the standards under both constitutional provisions were treated as the same and courts applied a subjective deliberate-

10

indifference standard. *See Gordon*, 888 F.3d at 1122-23. Under that subjective deliberate-indifference standard, a defendant was liable only if he "[knew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both [have been] aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and he must also [have drawn] the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (articulating the deliberate-indifference standard).

The use of a single deliberate-indifference standard has changed in the Ninth Circuit and several other circuits. *See Miranda v. County of Lake*, 900 F.3d 335, 351-52 (7th Cir. 2018) (collecting cases). Now, the deliberate-indifference standard that applies to a pretrial detainee's claim is an *objective* one rather than the subjective one that continues to apply to a convicted prisoner's claim. *Gordon*, 888 F.3d at 1124-25.

The elements of a pretrial detainee's medical care claim under the Due Process Clause are: "(i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries." *Id.* at 1125. For the third element, the defendant's conduct must be objectively unreasonable, "a test that will necessarily 'turn[] on the facts and circumstances of each particular case.'" *Id.* (alteration in original) (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)). "[T]he plaintiff must 'prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* (quoting *Castro*, 833 F.3d at 1071). Under this test, there is no separate inquiry into an officer's subjective state of mind. *See id.* at 1125 n.4.

2.    Analysis of Mr. Flentoil's Medical Care Claim

On the evidence in the record, Dr. Chyorny is entitled to judgment as a matter of law on the claim that his response to Mr. Flentoil's requests for Percocet, gabapentin, a hinged knee brace, and crutches violated Mr. Flentoil's Fourteenth Amendment right to due process.

The first element of a Fourteenth Amendment due process claim is that the "defendant made an intentional decision" with respect to the plaintiff's conditions. *Gordon*, 888 F.3d at 1125. Here, there were several intentional decisions. The parties agree that Dr. Chyorny refused to provide the Percocet and gabapentin each time that Mr. Flentoil requested them for his pain. That is one intentional decision.

Dr. Chyorny also made intentional decisions regarding the hinged knee brace and crutches. There is no evidence in the record that Dr. Chyorny was aware of Mr. Flentoil's request for a hinged knee brace before he first saw Mr. Flentoil on May 4. On May 4, Dr. Chyorny referred Mr. Flentoil to the physical therapy department to be fitted for a hinged knee brace so that the brace could be ordered. There is no evidence in the record that Dr. Chyorny was aware of Mr. Flentoil's request for crutches until the next visit, on June 20, at which time he approved crutches.[4] A reasonable jury could find that Dr. Chyorny made intentional decisions to approve a hinged knee brace and crutches to address Mr. Flentoil's knee pain when Dr. Chyorny was first made aware of those requests.

The second element of the *Gordon* test requires that the plaintiff be "at substantial risk of suffering serious harm" as a result of the conditions of his confinement. *Id.*[5] "[T]he presence of a medical condition that significantly affects an individual's daily activities [] or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment." *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller,* 104 F.3d 1133 (9th Cir. 1997). Here, the evidence

---

[4] Although Mr. Flentoil stated in his amended complaint that he made "almost daily" requests for crutches at the jail, Docket No. 21 at 2, he provides no evidence that those requests reached Dr. Chyorny. The mere fact that Dr. Chyorny was the medical director for the jail does not make him liable on a § 1983 claim based on the actions of employees at the jail because there is no respondeat superior liability under § 1983, i.e., no liability under the theory that one is responsible for the actions or omissions of an employee. *See Monell v. Dep't of Social Servs.,* 436 U.S. 658, 691 (1978).

[5] The second element pertains to the risk posed by the condition, not the risk posed by the defendant's decision with regard to that condition. For example, in *Castro*, where the same test was applied to a deliberate-indifference-to-safety claim from an inmate who was attacked by another inmate, allegedly due to the jailers' failure to take appropriate steps to prevent such attacks, the court observed that it was undisputed that the plaintiff-inmate "faced a substantial risk of serious harm at the hands of [the attacking inmate]." *Castro*, 833 F.3d at 1072.

would allow a reasonable jury to conclude that Mr. Flentoil's pain due to his failed knee surgery put him at substantial risk of suffering serious harm. There is insufficient evidence to allow a reasonable jury to conclude that Mr. Flentoil actually had diabetic neuropathy; although he states in his amended complaint that he had diabetic neuropathy, there is no medical documentation of it in the record nor does he state that a doctor ever diagnosed diabetic neuropathy.

The third element of the *Gordon* test is that "the defendant did not take reasonable available measures to abate that risk [of the plaintiff suffering serious harm], even though a reasonable official in the circumstances would have appreciated the high degree of risk involved." *Id.* at 1125. The defendant's conduct must be objectively unreasonable, and that involves looking at the facts and circumstances of the particular case. *Id.*

No reasonable jury could find that Dr. Chyorny's decisions with respect to Mr. Flentoil's knee pain were objectively unreasonable. The medications he requested were controlled medications that carried a substantial risk of abuse and were being sought by an inmate with a known drug abuse history. The undisputed evidence shows that: (1) Percocet, a controlled medication, is an opiate with a potential for serious side effects; (2) gabapentin is a controlled medication that is addictive and frequently subject to abuse, especially in jails and prisons; (3) Mr. Flentoil had a significant drug abuse history, including having tested positive for methamphetamine use only a month before he arrived at the jail in April 2018; (4) jail policy required an inmate to sign a pain management contract to obtain a controlled substance, a term of which required him to be truthful about his drug use; and (5) Mr. Flentoil falsely claimed he had been drug-free for a year when he requested on May 4 that Dr. Chyorny provide him Percocet. The evidence plainly shows that Dr. Chyorny did not simply deny Percocet and gabapentin and send the patient away untreated.

Significantly, pain-management options other than Percocet and gabapentin were used by Dr. Chyorny and other members of the medical staff to address Mr. Flentoil's pain. The undisputed evidence shows that: (1) medical staff prescribed ibuprofen and acetaminophen starting within a day of Mr. Flentoil's arrival at the jail; (2) a jail doctor referred Mr. Flentoil to an outside orthopedic surgeon on May 1, who determined that Mr. Flentoil was not a suitable

candidate for knee replacement; (3) jail medical staff provided Mr. Flentoil with a cane upon his arrival at the jail; (4) on May 4, Dr. Chyorny continued the ibuprofen and added a lidocaine patch for additional pain management; (5) on May 4, Dr. Chyorny also approved an ace wrap, ice, special shoes, and a soft knee brace, as well as referred Mr. Flentoil to the department that would fit him for the hinged knee brace he had requested; (6) on June 20, Dr. Chyorny offered the pain reliever Pamelor (which Mr. Flentoil declined), approved crutches for Mr. Flentoil, and unsuccessfully attempted to do a steroid/lidocaine injection into the knee; (7) later on June 20, Dr. Lou administered an injection into the bursa of the knee that helped alleviate the pain in one part of the knee; (8) physical therapy was provided to Mr. Flentoil; (9) a hinged knee brace was provided to Mr. Flentoil on or about August 23; and (10) Mr. Flentoil informed jail staff on September 7 that he did not need the hinged knee brace because the crutches and neoprene brace were sufficient. With regard to the crutches and hinged knee brace, the undisputed evidence is that Dr. Chyorny approved each when first made aware of Mr. Flentoil's request for them

      Given the many steps taken to address Mr. Flentoil's pain complaints, no reasonable juror could conclude that Dr. Chyorny did not take reasonable available measures to abate the risk posed by Mr. Flentoil's pain. *See, e.g., Fausett v. LeBlanc*, 553 F. App'x 665 (9th Cir. 2014) (affirming summary judgment for defendants where doctors did not provide Valium ordered in hospital-discharge instructions after spinal-fusion surgery and instead provided substitute medicine and other pain medications); *Gauthier v. Stiles*, 402 F. App'x 203 (9th Cir. 2010) (affirming dismissal; plaintiff's disagreement with the dosage and type of pain medication administered after surgery not deliberate indifference); *Burton v. Dowrey*, 805 F.3d 776, 785 (7th Cir. 2015) (reversing denial of defense motion for summary judgment; jail health-care provider's decision to provide synthetic opioid rather to provide opioids or contact the doctor who prescribed the opioids before incarceration was not deliberate indifference); *Brauner v. Coody*, 793 F.3d 493, 497 (5th Cir. 2015) (although plaintiff stated that he required more pain relief than the over-the-counter and prescription medications provided by prison doctors for his undisputed bone infection with open sores, "these are 'classic example[s] of a matter for medical judgment'" and, as a matter of law, do not amount to deliberate indifference); *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir.

2011) (district court properly dismissed claim that prison officials were deliberately indifferent in not prescribing medication stronger than Motrin for plaintiff's broken wrist because the medication decision was a matter of medical judgment); *Meuir v. Green Cnty. Jail Employees*, 487 F.3d 1115, 1119 (8th Cir. 2007) (summary judgment properly granted for defendants on inmate's claim that nurses were deliberately indifferent in prescribing Motrin but not medicated mouthwash for bleeding gums); *id.* at 119 ("In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that she did not feel she received adequate treatment"). Although some of these measures were taken by members of the medical staff other than Dr. Chyorny -- e.g., the cane, acetaminophen, and ibuprofen that were provided to Mr. Flentoil starting more than two weeks before Dr. Chyorny first saw him – they may be considered in determining whether Dr. Chyorny acted with objective deliberate indifference when he made his decisions about Mr. Flentoil. This is so because the doctor could take into account the measures already provided and did not need to issue redundant orders, e.g., he did not need to order a cane for a patient who already had a cane.

Mr. Flentoil's position appears to be that, because the outside orthopedist he had seen on April 5 before he went to jail had prescribed a hinged knee brace, crutches, and Percocet, Dr. Chyorny had no choice but to make those things immediately available to Mr. Flentoil. But Mr. Flentoil is wrong with this theory that would strip jail doctors of the ability to exercise any independent medical judgment. To prevail on a claim involving choices between alternative courses of treatment, a prisoner must show the defendant's "chosen course of treatment 'was medically unacceptable under the circumstances.'" *See Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004).[6] There is no evidence that the treatment modalities selected by the orthopedist Mr. Flentoil had seen a couple of weeks before arriving at the jail were the *only* acceptable

---

[6] *Toguchi* also requires that the inmate-plaintiff show that the defendant's course of treatment "was chosen 'in conscious disregard of an excessive risk to the prisoner's health,'" *Toguchi*, 391 F.3d at 1058, but that requirement only applies when the Eighth Amendment's *subjective* deliberate indifference test is being applied. "Conscious disregard" simply is not a part of the Fourteenth Amendment's *objective* deliberate indifference test.

treatments for knee pain. Mr. Flentoil has not shown that Percocet is the *only* medication that can be used to treat knee pain, such that any deviation therefrom would be medically unacceptable. The outside doctor who had prescribed Percocet may have assessed the abuse potential for that drug differently and may have been unaware that very recently Mr. Flentoil had been abusing drugs. Mr. Flentoil also has not shown that complete off-loading of weight is necessary to address knee pain, such that it would have been objectively unreasonable for jail medical staff to initially issue a cane rather than crutches to alleviate the discomfort involved in putting weight on the knee. Lastly, he has not shown that a hinged knee brace was medically necessary to address knee pain -- indeed, Mr. Flentoil didn't like the hinged knee brace once he tried it, so he gave it up. Moreover, when Mr. Flentoil arrived at the jail, he did not arrive with crutches or a hinged knee brace and apparently had not filled his Percocet prescription, thereby suggesting that even he did not think these measures necessary to address his pain.

Viewing the evidence and reasonable inferences in the light most favorable to Mr. Flentoil, no reasonable trier of fact could conclude that Dr. Chyorny's actions reflected objective deliberate indifference to Mr. Flentoil's pain. That is, no reasonable trier of fact could conclude that the denial of Percocet and gabapentin, or the delay of more than three months between Dr. Chyorny's initial referral for the hinged knee brace and its actual arrival, put Mr. Flentoil at a substantial risk of serious harm that could have been eliminated through reasonable and available measures that Dr. Chyorny did not take. *See Horton v. City of Santa Maria*, 915 F.3d 592, 602 (9th Cir. 2019) (under objective test, question is "whether there was a 'substantial risk of serious harm to the plaintiff that could have been eliminated through reasonable and available measures that the officer did not take, thus causing the injury that the plaintiff suffered'"). Because Mr. Flentoil's claim fails at the third element of the *Gordon* test, the Court need not the consider the fourth element, i.e., causation of injuries. Dr. Chyorny is entitled to summary judgment on the merits of Mr. Flentoil's Due Process Clause claim.

### 3. Qualified Immunity

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or

16

constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine of qualified immunity attempts to balance two important and sometimes competing interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine thus intends to take into account the real-world demands on officials in order to allow them to act "swiftly and firmly" in situations where the rules governing their actions are often "voluminous, ambiguous, and contradictory." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009). "The purpose of this doctrine is to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Id.*

To determine whether a government official is entitled to qualified immunity, courts must consider (1) whether the official's conduct violated a constitutional right, and (2) whether that right was "clearly established" at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232. Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

Here, Dr. Chyorny is entitled to qualified immunity on the first step of the analysis. As explained above, no reasonable jury could find that there was a due process violation based on the medical care decisions Dr. Chyorny made. Given the absence of evidence of the violation of a constitutional right, Dr. Chyorny is entitled to judgment in his favor on the defense of qualified immunity.[7]

B.     ADA/RA Claim

Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or

---

[7] Moreover, Mr. Flentoil has not identified any case that clearly establishes that the facts in his case amount to a 14th Amendment violation.

activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Although 42 U.S.C. § 12132 does not expressly provide for reasonable accommodations, an implementing regulation provides that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i). The duty to provide "reasonable accommodations" or "reasonable modifications" for disabled people under Title II of the ADA arises only when a policy, practice or procedure discriminates on the basis of disability. *Weinreich v. Los Angeles County MTA*, 114 F.3d 976, 979 (9th Cir. 1997). A plaintiff accordingly bears the burden of establishing the existence of specific reasonable accommodations that the defendant public entity failed to provide. *See id*. at 978.

To prove that a public program or service violated Title II of the ADA, the plaintiff must show: (1) the plaintiff is a qualified individual with a disability; (2) the plaintiff was either excluded from participation in or denied the benefits of the public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability. *Updike v. Multnomah County*, 870 F.3d 939, 949 (9th Cir. 2017); *Duvall v. County of Kitsap*, 260 F.3d 1124, 1134 (9th Cir. 2001). Essentially the same showing is required to state a cause of action under Section 504 of the Rehabilitation Act, codified at 29 U.S.C. § 794. *See Olmstead v. Zimring,* 527 U.S. 581, 589–91 (1999); *Duvall*, 260 F.3d at 1135. As the parties have not indicated any relevant difference between the ADA and Rehabilitation Act analyses for Mr. Flentoil's claims, the claims will be addressed together, as they frequently are. *See Duvall*, 260 F.3d at 1135.

Damages are not available for a violation of Title II of the ADA or the Rehabilitation Act absent a showing of discriminatory intent by the defendant. *See Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998). To show discriminatory intent, a plaintiff must establish deliberate indifference by the public entity. *Duvall*, 260 F.3d at 1138. Deliberate indifference requires: (1)

knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood. *Id.* at 1139. The first prong is satisfied when the plaintiff identifies a specific, reasonable and necessary accommodation that the entity has failed to provide, and the plaintiff notifies the public entity of the need for accommodation or the need is obvious or required by statute or regulation. *Id.* The second prong is satisfied by showing that the entity deliberately failed to fulfill its duty to act in response to a request for accommodation. *Id.* at 1139–40. The entity's duty is to undertake a fact-specific investigation to gather from the disabled individual and qualified experts sufficient information to determine what constitutes a reasonable accommodation, giving "primary consideration" the requests of the disabled individual. *Id.* The second prong is not satisfied if the failure to fulfill this duty to accommodate is a result of mere negligence, such as "bureaucratic slippage" or where the entity simply "overlooked" a duty to act. *Id.*

Mr. Flentoil's claims under the ADA and Rehabilitation Act seek damages for the alleged denial of reasonable accommodations during his incarceration. His amended complaint does not request injunctive relief; in any event, an injunctive relief request would be moot because he eventually received access to an adequate shower and later was released from the jail. His amended complaint also requests declaratory relief that the acts of Defendants violated federal law, but the declaratory relief request is dismissed as moot in light of his receipt of the requested accommodations. *Duvall*, 260 F.3d at 1132 n.4 (because plaintiff received the requested accommodations, "his claims for declaratory relief are now moot" even though his damages claim is not). The fact that this is an action for damages affects the showing that Mr. Flentoil must make because, as explained above, the ADA/RA plaintiff can obtain damages only if he shows that Defendant's conduct resulted from deliberate indifference to his rights under the ADA/RA.

The County of Santa Clara moves for summary judgment on Mr. Flentoil's ADA/RA claim, arguing that he was not denied meaningful access to showers or other services. The County urges that, "[e]very time Flentoil informed County employees of his need for accessible showers, he was granted such access within a few days." Docket No. 44 at 21. The Court disagrees that the evidence inevitably leads to the County's desired conclusion.

There are triable issues of fact as to whether the County of Santa Clara acted with a discriminatory intent in response to Mr. Flentoil's request with regard to the showers. A trier of fact reasonably could conclude that Mr. Flentoil needed assistance or accommodations to safely shower and that, acting with discriminatory intent, the County failed to provide the needed assistance or accommodations. Mr. Flentoil's verified amended complaint states that he requested accommodations for his injured knee when he arrived at the Santa Clara County Jail on April 17-18 and that he initially was placed into a special medical housing unit that had accessible showers, but Mr. Flentoil was moved three days later from that housing unit to general population, where the showers lacked accommodations (such as guard rails, shower chairs, or slip-resistant coating on the floor). Docket No. 21 at 3-4. Mr. Flentoil's evidence shows that he raised his concerns "about the lack of appropriate accommodation in general population shower area" on April 20, at which time the officer on duty responded that "'there is nothing [the officer] can do, classification and the doctor already cleared you to return to general population.'" *Id.* at 4. According to Mr. Flentoil, he was not moved to a module with an accessible shower until about May 21, a full month later. *Id.* at 4.

Viewing this evidence in the light most favorable to Mr. Flentoil, as the nonmoving party, a reasonable jury could conclude that Mr. Flentoil's comment to the officer on duty was "sufficient to alert[] the public entity to his need for accommodation," such that the public entity was on notice that an accommodation for his knee condition was required to satisfy the ADA, and thus showed "knowledge that a harm to a federally protected right is substantially likely," thereby satisfying the first element of the deliberate indifference test. *See Duvall*, 260 F.3d at 1139.

Viewing the evidence in the light most favorable to Mr. Flentoil, a reasonable jury could find that the County's failure to provide an accessible shower for a full month after Mr. Flentoil's comment to the officer on duty shows a failure to act to avoid the ADA violation, thereby satisfying the second element of the deliberate indifference test. *See id.; cf. Clinton v. Pend Oreille County Jail,* 2018 WL 2728025, *3 (E.D. Wash. 2018) (rejecting ADA claim from terminally ill inmate with "difficulty standing" who fell in jail shower and claimed jail did not provide adequate facilities or assistance to permit him to shower safety; "there are no facts in the

record demonstrating that he was prevented from showering, that he needed assistance or accommodation to safely shower, or that if he did need assistance or accommodation, the jail failed to provide it"); *Downey v. Snohomish County Sheriff's Office*, 2018 WL 3853716, *6-7 (W.D. Wash. 2018) (rejecting ADA claim from inmate-amputee who "utilized both a prosthetic leg and a wheelchair while at the Jail, [but] was able to ambulate without assistance on his prosthetic leg," and was occasionally sent to disciplinary housing that lacked an ADA shower because, "on the occasions plaintiff raised specific concerns regarding his placement in the maximum security unit related to his disability, he was accommodated"). A reasonable jury also could conclude from the comments of the officer on duty on April 20 that the failure to provide Mr. Flentoil an accessible shower for a month (from April 20 through May 21) was the result of a purposeful decision rather than "bureaucratic slippage that constitutes negligence" insufficient to establish deliberate indifference to support an ADA/RA claim for damages. *Updike*, 870 F.3d at 952.

In light of the triable issues on Mr. Flentoil's ADA/RA claim, the County's motion for summary judgment on the ADA/RA claim is **DENIED**.

C.    Referral To *Pro Se* Prisoner Mediation Program

This case appears a good candidate for the court's mediation program. Good cause appearing therefor, this case is now referred to Magistrate Judge Illman for mediation or settlement proceedings pursuant to the *Pro Se* Prisoner Mediation Program. The proceedings will take place within 120 days of the date this order is filed. Magistrate Judge Illman will coordinate a time and date for mediation or settlement proceedings with all interested parties and/or their representatives and, within five days after the conclusion of the proceedings, file with the Court a report on those proceedings.

Plaintiff must attend and participate in the mediation or settlement conference proceedings. The conference may be set up so that he will appear in person, by videoconference, or by telephone; plaintiff must attend whatever format Magistrate Judge Illman chooses. Plaintiff is cautioned that he may be sanctioned for failure to comply with an order to participate in a mediation or settlement conference, and such sanctions may include dismissal of part or all of the

action.  *See* Fed. R. Civ. P. 16(a), (f), and 41(b).

### VI.      <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART.**  Docket No. 44.  Dr. Chyorny is entitled to judgment as a matter of law in his favor on the merits of Mr. Flentoil's Due Process Clause claim and on the defense of qualified immunity to that claim.  The County of Santa Clara is not entitled to summary judgment on the ADA/RA claim for damages.

This action is now referred to Magistrate Judge Illman for mediation or settlement proceedings pursuant to the *Pro Se* Prisoner Mediation Program.  The Clerk shall send a copy of this order to Magistrate Judge Illman.

**IT IS SO ORDERED**.

Dated: February 5, 2020

_____
EDWARD M. CHEN
United States District Judge